UNITED STATES of America

v.

Charles G. ROSE III, Appellant.

No. 92–5241.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 12, 1993.

Decided July 12, 1994.

William C. Oldaker, Washington, DC, argued the cause and filed the briefs for appellant.

Charles Tiefer, Acting General Counsel, U.S. House of Representatives, Washington, DC, argued the cause and filed the brief for amici curiae Speaker and Bipartisan Leadership Group of the House of Representatives.

Douglas Letter, Appellate Litigation Counsel, U.S. Dept. of Justice, Washington, DC, argued the cause for appellee. With him on the brief was J. Ramsey Johnson, Acting U.S. Atty., Washington, DC, at the time the brief was filed.

Before BUCKLEY and RANDOLPH, Circuit Judges, and LEVIN H. CAMPBELL,* Circuit Judge, U.S. Court of Appeals for the First Circuit.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Charles G. Rose III, a member of the United States House of Representatives, appeals the denial of his motion to dismiss a civil action brought by the Department of Justice under the Ethics in Government Act. Congressman Rose contends that the complaint relies upon his testimony before the House Committee on Standards of Official Conduct in violation of the Speech or Debate Clause of the Constitution. He also argues that the separation of powers doctrine prohibits the Justice Department from bringing

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

this action because the Committee has already investigated him.

Rejecting both arguments, we affirm. Congressman Rose's testimony is not protected by the Speech or Debate Clause because it is unrelated to legislative matters. And the separation of powers doctrine does not bar this action because a prior investigation of Congressman Rose by the Committee does not prevent the Department of Justice from enforcing the Ethics in Government Act.

## I. BACKGROUND

### A. The Ethics in Government Act

Congress enacted the Ethics in Government Act of 1978 ("Ethics Act" or "Act"), Pub.L. No. 95–521, 92 Stat. 1824 (1978), in the aftermath of Watergate. Among other things, the Act established financial reporting requirements for key personnel in each of the three branches of the federal government, allocating these requirements to the three different parts of the U.S.Code governing the legislative, executive, and judicial branches. *See* 2 U.S.C. §§ 701–09 (1988) (legislative); 5 U.S.C. app. §§ 201–12 (1988) (executive); and 28 U.S.C. app. §§ 301–09 (1988) (judicial). (Although Congress has since consolidated the three sets of provisions under one title of the U.S.Code, we will refer to the provisions of the Act by their original designations to conform to the citations in the parties' briefs and the district court's opinion.)

Under the Ethics Act, Members of Congress must file a "full and complete" financial disclosure report by May 15th of each year. 2 U.S.C. §§ 702(a), 701(a). This report must include, *inter alia*, the "source, type, and amount or value" of non-U.S. government income aggregating $100 or more, *id.* § 702(a)(1)(A); gifts from a non-relative aggregating $100 or more, *id.* § 702(a)(2)(B); and liabilities to creditors over $10,000, except certain secured loans, *id.* § 702(a)(4).

Congress itself oversees its Members' compliance with these provisions. Representatives and Senators must file their reports, respectively, with the Clerk of the House and the Secretary of the Senate. *Id.* § 703(a),

(b). Committees designated by the House and Senate must review these reports and "determine whether [they] are filed in a timely manner, are complete, and are in proper form." *Id.* § 705(a). If a committee determines that a report was not properly filed, it "shall so inform the reporting individual and direct him to take all necessary corrective action." *Id.* The committees also may issue advisory opinions, which immunize those who rely upon them:

> [T]he designated committee[s] ... have power ... to render any advisory opinion interpreting this chapter, in writing, to persons covered by this chapter. Notwithstanding any other provisions of law, the individual to whom a public advisory opinion is rendered ... who ... acts in good faith in accordance with the provisions and findings of such advisory opinion shall not, as a result of such act, be subject to any sanction provided in this chapter.

*Id.* § 705(b). The "designated committee" in the House is the House Committee on Standards of Official Conduct. Rules of the House of Representatives, 101st Cong., 2d Sess., Rule X, cl. 1(t).

The House of Representatives has taken an additional step to ensure that its Members comply with the Ethics Act: Pursuant to its constitutional authority to regulate the conduct of its Members, *see* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member"), the House has adopted the full text of the Act as a House Rule. *See* House Rule XLIV, cl. 2.

While Congress has retained much of the task of ensuring compliance with the Ethics Act by its own Members, it has authorized

> [t]he Attorney General [to] bring a civil action in any appropriate United States district court against any individual who knowingly and willfully falsifies or who knowingly and willfully fails to file or report any information that such individual is required to report pursuant to section 702 of this title.

2 U.S.C. § 706. The section also authorizes the assessment of a civil penalty against such individual in an amount not to exceed $5,000. *Id.* It is under this provision that the Department of Justice ("DOJ") is suing Congressman Rose.

## B. Procedural History

In October 1986, the House Committee on Standards of Official Conduct ("Committee") received a complaint that Congressman Rose had failed to report various financial transactions in violation of House rules and the Ethics Act. The alleged transactions included personal loans from banks and from the Congressman's campaign committee totalling some $138,000. The complaint also charged that Congressman Rose had failed to report foregone interest on loans from his campaign committee and the use of a campaign committee asset as collateral for a personal loan. The Committee conducted an extensive investigation in which Congressman Rose cooperated and gave testimony.

On March 23, 1988, the Committee issued a report on its investigation. *In the Matter of Representative Charles G. Rose III,* H.R.Rep. No. 526, 100th Cong., 2d Sess. (1988) ("the Rose Report" or "the Report"). The Report concluded that Congressman Rose had violated both House rules and the Ethics Act. *Id.* at 25. Specifically, it found that he had (a) "borrowed from his campaign on eight separate occasions from 1978 to 1985, in violation of House Rule XLIII, clause 6"; (b) "pledged a $75,000 certificate of deposit belonging to his campaign on a personal loan ..., in violation of House Rule XLIII, clause 6"; (c) "failed to list as liabilities to his campaign the borrowings referred to [in (a) above] on his Financial Disclosure Statements" for the years 1982 through 1986, in violation of the Ethics Act and House Rule XLIV, clause 2; and (d) "failed to list liabilities to certain financial institutions on his Financial Disclosure Statements, in violation of the [Act]." *Id.*

In accordance with the Report's recommendation, the Committee sent "a formal and public letter of reproval" to Congressman Rose "as a public rebuke for the violations." *Id.* at 26, 523–25. The Report did not say whether the Committee had found the violations to be knowing and willful.

Meanwhile, the DOJ began investigating whether Congressman Rose had "knowingly and willfully" filed inaccurate financial statements. *See* 2 U.S.C. § 706. In a letter dated January 26, 1989, Acting Assistant Attorney General Brent Hatch advised the Committee that the DOJ was contemplating bringing a civil action against Congressman Rose and solicited the Committee's views on the matter. Appendix Exhibits at 22–25. The letter stated that "[b]ased on a review of the Complaint filed with the Committee on Standards, and [the Rose Report], we believe that Representative Rose has violated the disclosure requirements of the [Ethics Act]" and that "there is evidence that he knowingly and willfully failed to report" various loans and financial transactions. *Id.* at 22. Commenting on the DOJ's authority, Assistant Attorney General Hatch asserted that the Committee's investigation does not "preclude[ ] a civil penalty action [by the DOJ] for the failures to report the loans" and that "[t]he Attorney General's authority is not limited to instances in which the House either has not acted on such violations or has referred the matter [to the DOJ] for an enforcement action." *Id.* at 24–25.

The Chairman and Ranking Minority Member of the Committee responded in a letter dated February 9, 1989, urging the DOJ to drop its plans to proceed against Congressman Rose. Appendix Exhibits at 26–29. According to the letter, the Committee's investigation had led it to conclude that Congressman Rose had not knowingly and willfully violated the Ethics Act: "Instead, the Committee concluded that the congressman's disclosures were the result of the sincerely held, albeit incorrect, belief that his campaign organization owed him the funds disbursed." *Id.* at 27. The letter also suggested that a DOJ action against Congressman Rose would raise separation of powers concerns:

The United States Constitution, at Article I, clause 5, empowers the Congress to discipline its own Members. As a matter of policy, the Committee takes the position that it will be impaired in carrying out this

constitutional mandate[ ] if it must factor in with each case reviewed the actions another branch of government might take based on Committee actions. While not implying that the Department of Justice is precluded by law from pursuing the matter, it is critical that in the subject case the Committee did not fail to act consistent with its duties under [the Ethics Act].... Initiation of litigation as contemplated by the Department would not only be inconsistent with fairness, precedent and policy, but would also give rise to the inference that the Committee did not satisfy its responsibilities under House rules and statute [sic].

*Id.* at 28–29.

Notwithstanding the Committee's request, the DOJ filed this action against Congressman Rose on May 19, 1989. The complaint alleged six knowing and willful reporting violations between the years 1979 and 1985 and sought fines totalling $30,000. Congressman Rose moved to dismiss the complaint on three grounds. First, he asserted that the Rose Report constituted an advisory opinion under the Ethics Act, *see* 2 U.S.C. § 705(b), and thus provided him with immunity from suit. Second, he claimed that the action was barred by the Speech or Debate Clause because the complaint made use of his testimony before the Committee. Third, he argued that the separation of powers doctrine barred the DOJ from suing him after the Committee had fully investigated him.

Noting that claims of speech or debate immunity are subject to immediate appeal, the district court considered only Congressman Rose's argument that the DOJ's use of his testimony violated the Speech or Debate Clause. *United States v. Rose,* 790 F.Supp. 340, 340–41 (D.D.C.1992). The court held that Congressman Rose's testimony concerning his financial reporting was not a "legislative act" protected by the Clause because it fell "outside the deliberative and communicative functions of the House." *Id.* at 343 (quoting *United States v. Hansen,* 566 F.Supp. 162 (D.D.C.), *aff'd,* No. 83–1689 (D.C.Cir. Aug. 1, 1983) (unpublished order)). Accordingly, the court denied the motion to dismiss.

On appeal, Congressman Rose renews only his speech or debate and separation of powers claims. The Speaker and Bipartisan Leadership Group of the House of Representatives ("House Leadership Group") has filed an amicus curiae brief in support of these claims. We first consider whether they are properly before us.

## II. ANALYSIS

### A. Appellate Jurisdiction

 "Though the parties have not contested our subject-matter jurisdiction, we must independently satisfy ourselves that it exists." *International Bhd. of Teamsters v. Pena,* 17 F.3d 1478, 1481 (D.C.Cir.1994). Courts of appeal have jurisdiction only over "final decisions of the district courts," 28 U.S.C. § 1291 (1988), and thus may not entertain interlocutory appeals. *United States v. Hollywood Motor Car Co., Inc.,* 458 U.S. 263, 264–65, 102 S.Ct. 3081, 3082, 73 L.Ed.2d 754 (1982). In general, orders denying motions to dismiss are not "final decisions" because such orders "ensure[ ] that litigation will continue in the District Court." *Lauro Lines s.r.l. v. Chasser,* 490 U.S. 495, 498, 109 S.Ct. 1976, 1978, 104 L.Ed.2d 548 (1989) (internal quotation marks and citation omitted). Denials of claims of speech or debate immunity, however, fall within a well-recognized exception to this rule; such rulings are immediately appealable because the Speech or Debate Clause is designed to protect Members of Congress not only from liability but also from the cost and inconvenience of litigation. *Helstoski v. Meanor,* 442 U.S. 500, 506–08, 99 S.Ct. 2445, 2448–49, 61 L.Ed.2d 30 (1979); *see also Browning v. Clerk, U.S. House of Representatives,* 789 F.2d 923, 926 n. 6 (D.C.Cir.1986). Thus, Congressman Rose's Speech or Debate Clause claim is properly before us.

 We conclude that we also have jurisdiction over his separation of powers claim. Three other circuits have recognized claims of immunity based on the separation of powers doctrine as an additional exception to the general rule against interlocutory appeals. *See United States v. Claiborne,* 727 F.2d 842, 844 (9th Cir.1984) (federal judge arguing that

separation of powers doctrine immunized him from criminal prosecution could immediately appeal district court's denial of his motion to dismiss); *United States v. Hastings,* 681 F.2d 706, 708–09 (11th Cir.1982) (same); *United States v. Myers,* 635 F.2d 932, 935–36 (2d Cir.1980) (permitting congressional defendant in criminal prosecution to raise separation of powers defense as well as Speech or Debate Clause defense on pre-trial appeal).

The *Myers* case is particularly instructive because it involved a congressional defendant who, like Congressman Rose, brought an interlocutory appeal based on both the Speech or Debate Clause and the separation of powers doctrine. The court held that it had jurisdiction over both claims:

> Though [the separation of powers] doctrine does not provide as precise a protection as the Speech or Debate Clause, there are equivalent reasons for vindicating in advance of trial whatever protection it affords as a defense to prosecution on criminal charges. If, because of the separation of powers, a particular prosecution of a Member of Congress is constitutionally prohibited, the policies underlying that doctrine require that the Congressman be shielded from standing trial.

*Id.* at 935. While this case is a civil action and *Myers* was a criminal prosecution, we do not find that difference material. Like speech or debate immunity, separation of powers immunity should protect legislators from the burden of litigation and diversion from congressional duties, whether the litigation be civil or criminal. *See Helstoski,* 442 U.S. at 506–08, 99 S.Ct. at 2448–49 (interlocutory appeal of speech or debate claim allowable in criminal prosecution of Member of Congress); *Browning,* 789 F.2d at 926 n. 6 (interlocutory appeal of speech or debate claim in civil action against Speaker of House, Clerk of House, and others).

## B. The Speech or Debate Claim

We first must decide whether the complaint filed by the DOJ makes use of Congressman Rose's testimony. The DOJ contends that its complaint "does not mention [Rose's] testimony in any way." DOJ Brief at 41. While that may be true, there can be little doubt that the DOJ relied on the testimony in preparing the complaint. In opposing a discovery motion by Congressman Rose in the district court, the DOJ stated that

> [t]he allegations set forth in the government's complaint are largely taken from [the Rose Report] issued by the House Committee on Standards of Official Conduct, before which Mr. Rose defended his actions. They relate to a finite number of Mr. Rose's own transactions, which have been well ventilated in the Committee process.

Plaintiff's Opposition to Defendant's Motion for Extension of Time to Respond to Discovery at 2 n. 3, Civ. No. 89–1469 (D.D.C.1989). In addition, the letter from Acting Assistant Attorney General Hatch to the Committee makes clear that the DOJ's decision to sue Congressman Rose was "[b]ased on a review of the complaint filed with the Committee on Standards, and [the Rose Report]." Appendix Exhibits at 22. Much of the Rose Report consists of transcripts of Congressman Rose's testimony before the Committee. *See* Rose Report at 184–92, 302–405, 462–70, 498–99.

These statements persuade us that Congressman Rose's testimony was used to prepare the complaint; and if that testimony is protected, using it as background material for a complaint would clearly violate the Speech or Debate Clause. *See United States v. Helstoski,* 635 F.2d 200, 204–05 (3d Cir. 1980) (quashing indictment that was based on materials that were protected by Speech or Debate Clause, and noting that "the mere threat of an indictment is enough to intimidate the average congressman and jeopardize his independence").

In determining whether Congressman Rose's testimony is protected, it is helpful to begin with a brief history of the speech or debate privilege. It was formulated in seventeenth-century England following a long "history of conflict between the [House of] Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators." *United States v. Johnson,* 383 U.S. 169, 178, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966) (footnote

omitted). The enshrinement of the privilege in the English Bill of Rights of 1689 thus represented "the culmination of a long struggle for parliamentary supremacy." *Id.; see also* The English Bill of Rights of 1689, 1 W. & M., Sess. 2, c. 2 (1689), *quoted in Johnson,* 383 U.S. at 178, 86 S.Ct. at 754 ("That the Freedom of speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament.").

Like much of the English legal tradition, the speech or debate privilege was transplanted to American soil and ultimately took root in the Constitution, where it appears in the following form: "[F]or any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The rationale for including this provision in the nation's charter was explained by Thomas Jefferson and James Madison in these terms:

> In order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the coordinate branches, Judiciary and Executive. . . .

8 *Works of Thomas Jefferson* 322–23 (1797), *reprinted in* Philip B. Kurland & Ralph Lerner, 2 *The Founder's Constitution* 336 (1987).

But while the constitutional privilege was recognized as a necessary guarantor of legislative independence, it was also understood to be limited to the legislative sphere. Thus Jefferson would instruct that the privilege " 'is restrained to things done in the House in a Parliamentary course. . . . For [the Member] is not to have privilege contra morem parliamentarium, to exceed the bounds and limits of his place and duty.' " *Hutchinson v. Proxmire,* 443 U.S. 111, 125, 99 S.Ct. 2675, 2683, 61 L.Ed.2d 411 (1979) (quoting Thomas Jefferson, *A Manual of Parliamentary Practice* 20 (1854)). Indeed, the American speech

or debate privilege was to be a more modest shield than its English ancestor:

> We should bear in mind that the English system differs from ours in that their Parliament is the supreme authority, not a coordinate branch. Our speech or debate privilege was designed to preserve legislative independence, not supremacy.

*United States v. Brewster,* 408 U.S. 501, 508, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972) (footnote omitted).

To further the privilege's core purpose of "prevent[ing] intimidation by the executive and accountability before a possibly hostile judiciary," *United States v. Johnson,* 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966), without unduly trampling "the rights of private individuals," *Gravel v. United States,* 408 U.S. 606, 624 n. 15, 92 S.Ct. 2614, 2626 n. 15, 33 L.Ed.2d 583 (1972), the Supreme Court has restricted congressional speech immunity to "legislative acts." *Id.* at 624–25, 92 S.Ct. at 2626–27; *see also Johnson,* 383 U.S. at 185, 86 S.Ct. at 757 ("Our decision does not touch a prosecution which . . . does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them."). Such acts include not only speech or debate in either House, but also any act that is

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627. The Clause thus does not protect acts that are not "legislative in nature," even if they are performed in a Member's "official capacity." *Id.* Nor does it insulate "activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Brewster,* 408 U.S. at 528, 92 S.Ct. at 2545.

Applying these principles, the Court has held that the Speech or Debate Clause immunizes voting and various committee activities, such as "authorizing an investigation,"

"holding hearings," "preparing a report," and "authorizing the publication and distribution of that report." *Doe v. McMillan,* 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973) (dismissing claim against Committee members and staff for the acts of compiling and releasing a committee report); *see also Gravel,* 408 U.S. at 624, 92 S.Ct. at 2626 (holding that Senator who convened subcommittee hearing and read into record portions of top secret Defense Department documents was protected by Speech or Debate Clause and noting that "voting by Members and committee reports are protected"); *Minpeco, S.A. v. Conticommodity Services, Inc.,* 844 F.2d 856, 860 (D.C.Cir.1988) ("the process by which a committee takes statements and prepares them for publication clearly qualifies as an activity within the legislative sphere") (internal quotation marks omitted). Conversely, the Court has found that many activities routinely engaged in by lawmakers, such as constituent services, communications with government agencies, assistance in securing government contracts, and speeches delivered outside of Congress, do not qualify for immunity. *Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537; *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627; *see also Hutchinson,* 443 U.S. at 133, 99 S.Ct. at 2687 (privilege does not protect newsletters and press releases of Member).

■ Our survey of the history and scope of the Speech or Debate Clause leads us to conclude that it does not protect Congressman Rose's testimony before the Committee. The testimony related to allegations that Congressman Rose had violated the Ethics Act by failing to report various personal loans and included detailed explanations of each financial transaction at issue. The testimony was not addressed to a pending bill or to any other legislative matter; it was, instead, the Congressman's defense of his handling of various personal financial transactions. *See* Rose Report at 301–503. In short, Congressman Rose was acting as a witness to facts relevant to a congressional investigation of his private conduct; he was not acting in a legislative capacity.

■ The House Leadership Group nevertheless argues that if Congressman Rose had given his testimony on the House floor, rather than in a committee room, he would clearly qualify for speech or debate immunity. To the extent that this argument suggests that speech or debate immunity should not hinge on Congress's choice of the location in which it will conduct its business, we agree. By its terms, the Speech or Debate Clause prohibits questioning Members "for any Speech or Debate in either House"; it does not say where "in either House"—on the floor or in the committee room—the speech must occur. *See Coffin v. Coffin,* 4 Mass. 1, 28 (1808) (in construing the speech or debate privilege in the Massachusetts Constitution, Mass. Const. Ann. Pt. 1, art. 21, the court noted: "If a member . . . be out of the chamber, sitting in committee, executing the commission of the house, it appears to me that such member is within the reason of the article, and ought to be considered within the privilege"); *see also Kilbourn v. Thompson,* 103 U.S. 168, 202–03, 26 L.Ed. 377 (1880) (examining *Coffin* for "general idea" of speech or debate privilege "in the minds of the members of the constitutional convention").

But to the extent that the argument suggests that the Clause protects "speech . . . in either House" that is wholly unrelated to legislative business, we disagree. The Supreme Court has held that "the Speech or Debate Clause prohibits inquiry only into those things generally *said or done in the House or the Senate in the performance of official duties* and into the motivation for those acts." *Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537 (emphasis added); *see also Coffin,* 4 Mass. 1, 28 ("[A Member] ought therefore to be protected from civil or criminal prosecutions for *every thing* [sic] *said or done by him in the exercise of his functions,* as a representative in committee, either in debating, in assenting to, or in draughting a report.") (emphasis added). Thus, we rely not on the fact that Congressman Rose testified in a committee room but on the fact that his testimony was given in a personal capacity rather than "in the performance of [his] official duties"; we focus on what Congressman Rose said, not where he said it.

*Ray v. Proxmire,* 581 F.2d 998 (D.C.Cir. 1978), which is relied upon by the House

Leadership Group, is thus distinguishable. In *Ray,* we found that Senator Proxmire's letter to the Chairman of the Senate Select Committee on Standards and Conduct was protected by the Speech or Debate Clause. *Id.* at 1000. The letter was in response to an allegation that Senator Proxmire had misused Senate rooms, an allegation that directly touched the institution of the Senate and raised a possible violation of Senate Rules. Indeed, the *Ray* court pinned its holding on a finding that the Senate inquiry was into the "exercise of [Senator Proxmire's] official powers." *Id.* By contrast, in this case, the House Ethics Committee was probing allegations that Rose had failed to report certain personal financial transactions.

■■■ Our focus on the content of the speech also disposes of the argument by the House Leadership Group that Congressman Rose's testimony is protected because he was speaking to other Members; the key factor is the subject matter of the speech, not the identity of the listener. We are not alone in reaching this result. In *Federal Election Comm'n v. Wright,* 777 F.Supp. 525 (N.D.Tex.1991), a case that is almost on all fours with this one, the court held that the Speech or Debate Clause did not protect former House Speaker James Wright's testimony before the Committee on Standards of Official Conduct about the use of his campaign funds: "[A]ny testimony given by Wright to the Committee on Standards was given by him in his capacity as a witness and not in his legislative capacity with the consequence that no immunity attached by virtue of the Clause." *Id.* at 530.

*United States v. Myers,* 692 F.2d 823 (2d Cir.1982), and *United States v. Hansen,* 566 F.Supp. 162 (D.D.C.), *aff'd,* No. 83–1689 (D.C.Cir. Aug. 1, 1983) (unpublished order), offer further support for this position. Both cases held that the filing by Members of Congress of financial disclosure reports under the Ethics Act was not a protected "legislative act." *See Myers,* 692 F.2d at 849 ("Disclosure of income from sources other than employment by the United States is no part of [the] deliberative and communicative processes [by which Members participate in committee and House proceedings.]") (inter-

nal quotation marks and citations omitted); *Hansen,* 566 F.Supp. at 169–70. It is but a short step from those rulings to hold that testimony by a Member of Congress about the filing of a financial disclosure report under the Ethics Act is not protected.

Two courts, however, have drawn the line differently. In *United States v. Eilberg,* 465 F.Supp. 1080, 1082–83 (E.D.Penn.1979), the district court found that a congressman's testimony before the Committee on Standards of Official Conduct was protected by the Speech or Debate Clause. The court relied on the statement from *Gravel* that "a member's conduct at legislative committee hearings ... is within the sphere of legitimate legislative activity." *Id.* at 1083 (quoting *Gravel,* 408 U.S. at 624, 92 S.Ct. at 2626 (internal quotation marks omitted)). But the "member's conduct" referred to in *Gravel* was Senator Gravel's convening and chairing of a subcommittee meeting, and his reading into the record portions of the Pentagon Papers. Congressman Rose, by contrast, was neither a member of the Ethics Committee nor one of its agents. Thus, we do not think he was participating in the Committee's deliberations in the way envisaged by the *Gravel* Court.

■■■ *United States v. Durenberger,* No. 3–93–65, 1993 WL 556454 (D.Neb. Dec. 6, 1993), which held that representations by a Senator and his aide to the Senate Ethics Committee were protected, likewise rests on a misreading of Supreme Court precedent. The *Durenberger* court read *Doe v. McMillan,* 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973), for the proposition that legislative acts include "providing testimony," a phrase that nowhere appears in *Doe. Durenberger,* slip op. at 2, 1993 WL 556454. Indeed, the Supreme Court has never decided if the Speech or Debate Clause protects a Member's testimony given in a personal capacity to a congressional committee. We conclude that it does not based on our review of the history and purpose of the Clause.

C. The Separation of Powers Claim

Congressman Rose argues that the constitutional provision granting each House the power to regulate the conduct of its Mem-

bers, *see* art. I, § 5, cl. 2, bars the DOJ from bringing an action charging "knowing and willful violations" of the Ethics Act after the Committee has determined that the violations were inadvertent. Congressman Rose also contends that allowing the DOJ to ignore Committee decisions would hinder the Committee because Members of Congress would refuse to cooperate with Committee investigations lest the DOJ turn their testimony against them in a subsequent civil action, and because Committee members would worry that their findings might serve as ammunition in a subsequent DOJ lawsuit.

We do not think the DOJ's action against Congressman Rose offends the separation of powers doctrine. The DOJ brought this action under section 706 of the Ethics Act, which authorizes it to investigate and prosecute "knowing and willful" violations of the Act. 2 U.S.C. § 706. It is true that the disclosure requirements of the Ethics Act applicable to Members of Congress have been incorporated into the House Rules, *see* House Rule XLIV, cl. 2 (adopting full text of Ethics Act), which are enforced by the House pursuant to its constitutional power to discipline its Members. But by codifying these requirements in a statute, Congress has empowered the executive and judicial branches to enforce them; in bringing this action, then, the DOJ was fulfilling its constitutional responsibilities, not encroaching on Congress's.

Moreover, Congressman Rose's assertion that lawsuits by the DOJ will discourage Members of Congress from cooperating with the Committee does not trouble us because the Committee has the power to refer evidence of ethical violations disclosed in a committee investigation to the DOJ. *See* House Rule X, cl. 4(e)(1)(C); *see also* H.R.Rep. No. 1817, 95th Cong., 2d Sess., at 59 (noting that testimony by former Members involved in Korean influence-peddling scandal was sent to DOJ for consideration of possible perjury charges). Thus, even if we dismissed this action, Members would have no guarantee that their voluntary cooperation with the Committee would not be used against them in a subsequent DOJ action.

We are conscious of the Committee's concern, as expressed by its Chairman and Ranking Minority Member in their letter to Acting Assistant Attorney General Hatch, that the Committee "will be impaired in carrying out [its constitutional mandate] if it must factor in with each case reviewed the actions another branch of government might take based on Committee action." Appendix Exhibits at 28–29. With respect, however, we see no "risk of control, interference, or intimidation [of the Committee] by [an]other branch[ ]," *Nixon v. Fitzgerald,* 457 U.S. 731, 761, 102 S.Ct. 2690, 2707, 73 L.Ed.2d 349 (1982) (Burger, C.J., concurring), merely because the Committee's deliberations might be affected by an awareness that the DOJ might make use of its proceedings to bring an action against a Member. Executive agencies are fully aware that their actions might trigger a congressional response, and it is common knowledge that they will at times trim their sails as a consequence. Yet no one suggests that the separation of powers is threatened by this interaction between the two branches as each pursues its constitutional responsibilities.

Nevertheless, should the Committee find its work inhibited by the ability of the DOJ to make use of it, the Committee is quite capable of protecting its interests. For example, if the Committee had wished to prevent the DOJ from using any part of its proceedings to prosecute Congressman Rose, it could have declined to issue a report or issued one in redacted form. And if Congress as a whole feels threatened by DOJ actions such as this one, it can amend the Ethics Act to restrict the jurisdiction of the DOJ or to exempt Members of Congress. But as the Committee has made public Congressman Rose's unprotected testimony by issuing a report, we see no separation of powers concerns that should bar the DOJ from following its statutory mandate.

## III. CONCLUSION

For the foregoing reasons, the district court's decision is affirmed; and the case is

remanded to the district court for further proceedings.

*So ordered.*